MARIE SONNEK, Plaintiff and Respondent, *v.* UNIVER-
SAL C. I. T. CREDIT CORPORATION, a Delaware Cor-
poration, and RALPH MERRITT, Defendants and Appel-
lants, UNIVERSAL C.I.T. CREDIT CORPORATION, a
Corporation, Plaintiff and Appellant, *v.* MARIE SON-
NEK, Defendant and Respondent.

No. 10364.
Submitted May 17, 1962. Decided August 24, 1962.
374 P.2d 105.

504

S. M. Swanberg (argued orally), and William Scott, Great Falls, for appellants.

Skedd, Harris & Massman, Hollis G. Connors (argued orally), Helena, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment of the district court of the eighth judicial district. The action involved two independent cases consolidated for trial because both grew out of the same set of facts.

On March 20, 1959, Marie Sonnek, hereinafter referred to as the buyer, on a trip from Helena to Lewistown, Montana, stopped in Great Falls. She noticed a small Goliath automobile, hereinafter referred to as first car, displayed on Ralph Merritt's sales lot. The buyer gave Merritt, hereinafter referred to as the dealer, her Chrysler car at a value of $300 and $500 in cash as a down payment on the first car. The buyer signed and turned over title to her Chrysler and executed a chattel mortgage to secure the balance of the purchase price on the first car. The mortgage form appears to have been prepared by Universal C.I.T. Credit Corporation, hereinafter referred to as the Credit Corporation, for the use of the dealer. The dealer assigned the chattel mortgage to the Credit Corporation.

The buyer left Great Falls driving the first car, but before she reached Lewistown, the engine burned out because of faulty service thereto by the dealer. The buyer had the car towed to Lewistown and called the dealer. The dealer provided a substitute car and agreed to replace the burned out engine.

After returning to Helena, the buyer made several calls to the dealer regarding the replacement of the engine in the first car. On April 17, 1959, the buyer drove to Great Falls to see the

dealer. The dealer then induced the buyer to purchase a second car represented by the dealer to be a 1959 Goliath sport coupe. This car, hereinafter referred to as the second car, was in fact a 1958 model. The dealer also agreed: to take back the first car, credit the buyer with her down payment on the first car, cancel the mortgage on the first car, furnish proper 1959 license plates for the second car, and transfer title to the second car to the buyer.

The buyer surrendered possession of the first car and all papers in connection with its purchase. She then executed a chattel mortgage on the second car for a purchase price balance which included credit charges minus $800 credit for the down payment made on the first car. The dealer assigned the second mortgage, which in form was the same as the mortgage on the first car, to Credit Corporation. The buyer paid six monthly installments on the second car mortgage to the Credit Corporation. Including her down payment, the six monthly installments of $63.47 each, and $7.60 to keep her account current, the buyer paid a total of $1,188.42 towards the purchase of the second car. The buyer did not pay any of the monthly installments provided for in the chattel mortgage on the first car. The first car was repossessed by Credit Corporation and sold for $598 to an auto wholesale company and used car dealer in Portland, Oregon.

The buyer stopped making payments on the second car in November 1959. At no time did the Credit Corporation or dealer deliver to buyer proper title papers to either the first or second car even though she made many demands for the titles.

Consequently, she was unable to obtain 1960 license plates for the second car. The dealer did not cancel the mortgage on the first car. The buyer notified the Credit Corporation by letter on February 16, 1960, that she was rescinding the contract for the purchase of the second car and demanded the return of what she had paid on the contract.

On that same day the buyer instituted an action against the dealer and the Credit Corporation to have the two chattel mort-

gages declared null and void and for damages of $1,188.42 with interest thereon. In that action the Credit Corporation cross-complained alleging that it was a bona fide purchaser for value of both chattel mortgages without notice of defects of title and it sought judgment for $904.90 on the first chattel mortgage and $1,904.10 on the second one.

Subsequently, the Credit Corporation brought an action against the buyer to replevin the second car. The Credit Corporation alleged that it was the assignee of the mortgage on the car and sought to recover the car or its value of $1,750 if the car could not be delivered. The buyer cross-complained alleging that on February 16, 1960, she notified the Credit Corporation that she elected to rescind the mortgage on grounds of fraud practiced upon her by the dealer and she asked for damages of $1,188.42, the amount she had paid on the mortgage. Upon stipulation of the parties the second car was sold at public auction. The car was sold for $260 and, after the sheriff's fees, commission and expenses were deducted, $256 was deposited in court.

Both actions were tried without a jury. The court entered findings of fact and conclusions of law, and gave judgment for the buyer cancelling both mortgages and awarding damages of $1,188.42 with interest. The Credit Corporation appealed.

The Credit Corporation specifies as error the entering of judgment in favor of buyer in both actions. Under this single specification of error the appellant raises the questions hereafter discussed.

■ The first question for consideration is whether or not the two chattel mortgages involved are negotiable instruments so that the Credit Corporation could claim to be a holder in due course. We hold that they are not. The instruments are not payable at a determinable future time within the meaning of section 55-204, R.C.M.1947.

Sections 55-101 through 55-1706 constitute our Negotiable Instruments Law which is substantially the same (the varia-

tions are unimportant here) as the Uniform Negotiable Instruments Law.

Section 55-201, R.C.M.1947, provides in part:

"An instrument to be negotiable must conform to the following requirements: * * *

"3. Must be payable on demand, or at a fixed or determined future time; * * *."

Section 55-204, R.C.M.1947, provides:

"An instrument is payable at a determinable future time, within the meaning of this act, which is expressed to be payable:

"1. At a fixed period after date or sight; or,

"2. On or before a fixed or determinable future time specified therein; or,

"3. On or at a fixed period after the occurrence of a specified event, which is certain to happen, though the time of happening be uncertain.

"An instrument payable upon a contingency is not negotiable, and the happening of the event does not cure the defect."

Both mortgages contain the following: "If customer defaults on any obligation under this mortgage, or if the holder shall consider the indebtedness or the car insecure, the full balance shall without notice become due forthwith."

The rule under the Uniform Negotiable Instruments Law, covering an acceleration clause wherein the holder may accelerate payment when he deems himself insecure, is that where an instrument is payable whenever the payee or holder deems himself insecure the due date is uncertain and the instrument is non-negotiable. Murrell v. Exchange Bank, 168 Ark. 645, 271 S.W. 21, 44 A.L.R. 1391; Guio v. Lutes, 97 Ind.App. 157, 184 N.E. 416; Moyer v. Hyde, 35 Idaho 161, 204 P. 1068, 28 A.L.R. 695; see Great Falls National Bank v. Young, 67 Mont. 328, 215 P. 651, for recognition of the rule.

This acceleration clause in this case is objectionable in that the date of maturity is placed wholly within the control of the holder, and it is rendered independent of any act done or

omitted by the maker. Since the clause is sufficient to render the instruments non-negotiable, we will not consider other provisions therein which we feel would also make the instruments non-negotiable. The instruments being non-negotiable, the Credit Corporation could not be a holder in due course.

This bring us to the question of whether the assignee Credit Corporation took the mortgages subject to the defenses of the buyer.

Section 58-303 R.C.M.1947, reads as follows:

"A non-negotiable written contract for the payment of money or personal property may be transferred by indorsement, in like manner with negotiable instruments. Such indorsement shall transfer all the rights of the assignor under the instrument to the assignee, subject to all equities and defenses existing in favor of the maker at the time of the indorsement."

Under this section an assignee of a non-negotiable chattel mortgage takes the instrument subject to all defenses and equities existing at the time of the assignment which the mortgagor could assert against the assignor mortgagee. See Apple v. Edwards, 92 Mont. 524, 16 P.2d 700, 87 A.L.R. 179. Thus, in the present case the Credit Corporation took the two mortgages subject to the buyer's defenses and equities which existed at the time of the assignment of the two instruments to Credit Corporation.

The buyer's defense to the second mortgage was fraudulent representations of the Credit Corporation's assignor, the dealer, and, in her cross complaint, the buyer asked for rescission of both mortgages on the grounds of fraud of the Credit Corporation's assignor and failure of the parties to provide her with title. In the buyer's action for rescission, she alleged fraud on the part of Credit Corporation's assignor and failure of the assignor dealer to provide her with title. The findings of fact clearly substantiate the buyer's defenses and grounds for rescission.

In Ludwig v. Steger, 99 Cal.App. 235, 278 P. 494, a suit by

an assignee upon a promissory note given for the purchase of an automobile, a California court considered portions of California's Motor Vehicle Act which were substantially the same as section 53-109, R.C.M.1947. The buyer did not inquire about or demand a title certificate subsequent to the sale or prior to the action. Concerning the buyer's defense of failure of consideration, the court held:

"Since the certificate of ownership of the automobile, the sale of which furnishes the only basis of consideration for the promissory note involved in the present action, was never signed or transferred by the vendor and the motor vehicle department has consequently never issued a new certificate of ownership, the title to the machine did not pass to the defendants, but still remains in the owner, Scott. Hence, the note was without consideration and void."

In the instant case, the buyer upon several occasions, inquired about and demanded the transfer of title to the second car to her. Credit Corporation's assignor, the dealer, did not comply with section 53-109, supra. Subdivision (d) of that section specifically provides that:

"Until said registrar shall have issued a certificate of registration and certificate of ownership and statement as hereinbefore provided, delivery of any motor vehicle shall be deemed not to have been made and title thereto shall not have passed and said intended transfer shall be incomplete and not be valid or effective for any purpose."

██ The transactions in question were without consideration since title did not pass to buyer. Under section 13-903, R.C.M.1947, buyer was entitled to rescind on grounds of fraud and failure of consideration. See Thompson v. Sprague, 107 Cal.App.2d 647, 237 P.2d 275.

██ The Credit Corporation contends that the buyer should have been charged with the reasonable value of the use of the second car. That point was not raised by the pleadings nor was there any evidence as to the reasonable value of the use of the

car. See Milne v. Leiphart, 119 Mont. 263, 174 P.2d 805; see Black Motor Co. v. Green, 258 Ky. 72, 79 S.W.2d 409.

Finding no error in the record the judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES ADAIR, DOYLE, and JOHN C. HARRISON concur.